[Nos. A116523, A119262. First Dist., Div. Three. Mar. 28, 2008.]

JOSEPH GARZA et al., Plaintiffs and Respondents, v.
ASBESTOS CORPORATION, LTD., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Discussion, parts A., C., and D.

652

## COUNSEL

Wilson, Elser, Moskowitz, Edelman & Dicker, Patrick M. Kelly, Bernard Gehlhar and Richard E. Lerner, *pro hac vice*, for Defendant and Appellant.

Brayton Purcell, Alan R. Brayton, Lloyd F. LeRoy, Mary E. Pougiales and David Fermino for Plaintiffs and Respondents.

## OPINION

HORNER, J.[*]—In this consolidated appeal,[1] defendant Asbestos Corporation, Limited (ACL), appeals a jury verdict in favor of plaintiffs Joseph and Mary Garza on their complaint for damages for personal injury and loss of consortium filed after Joseph contracted asbestosis. We affirm.

### PROCEDURAL BACKGROUND

On January 26, 2005, plaintiffs filed their complaint for personal injury and loss of consortium alleging that Joseph's exposure to asbestos and asbestos-containing products caused him severe and permanent lung damage, as well as increased risk and fear of developing mesothelioma and lung cancer. According to the complaint, Joseph was diagnosed with asbestosis and asbestos-related pleural disease in May 2004. The complaint included causes of action for negligence and strict liability.[2]

ACL filed an answer to the complaint on February 22, 2006, including notice of its request for trial by jury pursuant to Code of Civil Procedure section 631.[3] ACL denied the allegations of the complaint and listed various "affirmative defenses," including one stating that "because all sales by this answering defendant were F.O.B. Quebec, Canada, this Court lacks personal jurisdiction over this defendant." On June 14, 2006, ACL appeared at a

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] ACL's notice of appeal in case No. A116523 was lodged and received on January 24, 2007. Subsequently, after the trial court granted in part and denied in part its motion to tax costs and entered judgment on the special verdict nunc pro tunc, ACL filed a second notice of appeal in case No. A119262, lodged and received on October 3, 2007. By order dated October 11, 2007, this court consolidated the two appeals for good cause upon stipulation of the parties.

[2] The complaint incorporated by reference designated portions of the "Master Complaint for Personal Injury [and Loss of Consortium]—Asbestos" filed on January 2, 2003 in San Francisco Superior Court.

[3] Further statutory references are to the Code of Civil Procedure unless noted otherwise.

pretrial conference, after which the court continued the matter to June 19 and ordered parties to file any motions in limine by that date.

One of ACL's various motions in limine filed on June 15, 2006, was styled: "Defendant Asbestos Corporation Ltd.'s Motion *in Limine* to preclude the exercise of personal jurisdiction (Motion in Limine No. 1)." ACL argued it was a Quebec company that had not consented to jurisdiction, was not physically present in California, and lacked sufficient contact with the state for the court to assume either general or limited jurisdiction over it. Plaintiffs opposed the motion, asserting among other things that ACL had consented to jurisdiction by making a general appearance. On June 20, 2006, the trial court denied without comment ACL's motion in limine regarding personal jurisdiction.

The jury heard opening statements from counsel on June 23, 2006. The trial court instructed the jury under California law on theories of negligence as well as strict liability based on both defective design and failure to warn. The trial court also instructed the jury on economic, noneconomic and punitive damages. Counsel delivered closing arguments on the morning of July 6, 2006. The following morning the jury returned a special verdict in favor of plaintiffs on all allegations. The jury found that ACL sold a product that did not perform as safely as an ordinary consumer would have expected, that the use was both reasonably foreseeable and a substantial factor in causing injury to Joseph Garza, and that the risks of its use were known or knowable to ACL at the time it sold the asbestos. The jury also found that ACL failed to adequately warn about the risks of asbestos fibers and that ordinary consumers would not have recognized those potential risks. The jury also found that ACL was negligent and that its negligence was a substantial factor in causing harm to Joseph Garza.

The jury awarded damages to Joseph Garza as follows: $127,294 in past and $325,000 in future medical expenses; $66,700 in future lost earning capacity; $21,000 in past and $139,000 in future loss of household services; and $500,000 in noneconomic damages. The jury also determined that Mary Garza suffered damages in the amount of $400,000 for loss of consortium. The jury allocated 75 percent of liability to ACL and 25 percent to all others, and also found by clear and convincing evidence that ACL acted with malice or oppression. Based on the jury's finding of malice, the trial proceeded to a separate phase on punitive damages. At the conclusion of the punitive damages phase, the jury returned a verdict of $10 million in punitive damages. On December 4, 2006, the trial court denied ACL's motion for judgment notwithstanding the verdict and its motion for a new trial on the

grounds they "lack[] substantive merit." ACL filed a notice of appeal on December 4, 2006, stating it appealed "the judgment filed and entered on August 8, 200[6]." On January 10, 2007, ACL filed its amended notice of appeal from judgment and post-judgment orders to include appeal not only from the judgment but also from the orders denying its motion for judgment notwithstanding the verdict and its motion for new trial.

FACTUAL BACKGROUND

Evidence adduced at trial concerning Joseph Garza's asbestos-related disease and ACL's asbestos product was as follows: Joseph Garza testified that he was born in Mercedes, Texas, in August 1930, and lived in the Rio Grande Valley until he was 17 years old. Garza joined the United States Navy when he was almost 18 years old, and after boot camp training he was posted to the aircraft carrier USS Antietam. Onboard the Antietam, Garza was assigned as a fireman apprentice. After a short spell on the Antietam, Garza was assigned to the troop carrier and cargo ship, USS Randall, which was undergoing repairs at Hunters Point shipyard in San Francisco. Garza served as fireman first class on board the Randall for about 18 months and then was promoted to the rank of boiler man, petty officer third class. Garza served on the Randall for five or six years and attained the rank of petty officer second class. The insulation in the boiler rooms was in poor condition when Garza arrived on board the Randall, and required a lot of repair work to get the boilers back into top shape. This entailed lagging the pipes and sealing the joints and flanges where lagging could not be applied with a type of adhesive cement. The cement material came either in buckets premixed, or in bags, which had to be mixed, and it was applied by hand with a putty knife or trowel. The material in the bags was mixed with water in a five-gallon bucket by hand using a stick or whatever else was handy. There was always dust thrown up when the bags were opened and emptied into the bucket. The dust got on Garza's clothing and into his hair. He was never given any respiratory protection while doing this work. Garza and his crewmates wore their dust-covered clothing back in their berthing compartment and sometimes wore the same clothes on multiple shifts. After any repair to the piping insulation, Garza and his crewmates cleaned up insulation debris using brooms and foxtails and there was always dust in the air while they were doing this. After Garza left the Randall in about 1955, he went to the destroyer USS Agerholm. He worked on board the Agerholm as boiler man second class for about 18 months. Garza was in charge of the number 2 boiler room, with a crew of about a dozen seamen. The work he did on board the Agerholm was similar to what he did on the Randall, working with piping insulation and adhesive cements. Conditions were more cramped on the Agerholm and ventilation was much poorer. Garza never wore respiratory

protection on board the Agerholm and, as on the Randall, his clothes and hair would get covered in dust from the materials and debris he worked with. Garza identified a product known as Eagle-Pitcher Super 66, which he used all the time for insulation repairs aboard the Randall and the Agerholm. Each boiler room on the ships always had at least a bag of Super 66 available.

After Garza left the Navy in 1957, he worked for Westinghouse between 1957 and 1973. He started with the company testing hydraulic and hydrostatic components and the integrity of materials for use in turbines and other marine equipment. About six times per year, Garza would have to assemble the steam lines for testing equipment and during this process the insulation on the pipes was disturbed and gave off dust. At Westinghouse, as well as in the Navy, Garza worked with another type of insulation called rope packing, a fiber material that looks like rope, which can be used wet or dry to insulate hard-to-reach areas. Packing pullers, corkscrew-type implements, were used to remove rope packing, which sometimes came out in pieces. Garza never wore respiratory protection at Westinghouse. After Garza left Westinghouse in 1973, he had various jobs involving contact with insulation materials until he retired in 1993 at age 63. These included spells with Basapan at Moffet Field as a boiler operator, where he handled the same type of insulation materials he worked with on the ships and also refurbished boilers completely, which involved tearing out brick, mortar, and insulation blocks from inside the boiler firebox, a small five-foot-by-seven-foot area. In 1978 the family moved to Willits, and after that Garza worked as a maintenance mechanic for Microphor, where he hung drywall and sanded drywall compound in a project. From around 1980–1981 to about 1900–1991 he commuted weekly to the Bay Area to work for Varian Associates in Palo Alto as a building maintenance mechanic. Varian manufactured electron tubes. At Varian, he may have been exposed to asbestos while working in the attic among the insulated pipes. These pipes were deteriorating and giving off dust until Varian had a company "encapsulate" the insulation by spraying it with adhesive. For about six months while he was with Varian, Garza held a second job as a maintenance mechanic with Certainteed, a company that made fiber cement pipes. On three occasions, Garza actually had to go into the silos to repair the augers, where he worked "up to his knees" in fiber of some sort.

Between his retirement in 1993 and 2000, Garza spent his time working around the house and gardening. In 2000, Garza and his wife moved from Willits, California, to Colorado to be near their daughter and her husband, and "enjoy life out there in the mountains." When he first moved to Colorado, Garza was not experiencing any breathing problems. His wife Mary was also very active and did a lot of needlepoint and other home crafts.

Mary, however, developed health problems: She had part of an intestine removed, a cyst that had to be removed, then she developed diabetes and began to lose the use of her legs. For the last few years, Mary has been almost completely dependent on Garza for her daily needs.

Garza first had serious trouble breathing in 2003. Dr. Peter Holt ordered X-rays and blood tests before diagnosing Garza with asbestosis. Before that time, Garza had always been healthy, had never been hospitalized or had surgery, and had "never been down because of sickness other than having a slight cold or cough of that nature." Since he was diagnosed with asbestosis, Garza has been taking a series of medications, including steroids, to help him breath, as well as pain killers for pain in the left lower quadrant of his lung. At first, Garza took a mild pain killer but the dosage has increased over time. Garza also takes a mild tranquilizer "to take the edge off" when he gets upset about not being able to do things he has always done, like gardening, mowing the lawn, and playing with his grandkids. For over two years, Garza has been using an oxygen unit to assist his breathing. Now, Garza said he can walk only about half a block, cannot do even small things without getting exhausted, and his view of the future is "bleak." His condition is irreversible and what worries him most is his decreasing ability to take care of his wife and he worries who will look after her when he is gone. He and his wife have talked about that and his wife is concerned and worries about what is going to happen. Garza agreed with an estimate that put him at 65 percent disabled in February 2005, increasing to 80 percent disabled today.

The deposition testimony of Robert Bockstahler, deceased, was read to the jury. Bockstahler's deposition was taken on November 2, 1995, in the San Francisco actions. Bockstahler worked for Eagle-Pitcher Industries of Cincinnati, Ohio, from October 1955 until July 1991, when he took early retirement from his position as director of claims after the firm went into bankruptcy. In December 1966, Bockstahler became the general sales manager for the unit of the company that sold industrial insulation products. In that capacity, Bockstahler was familiar with the manufacturing process for asbestos containing cement. In 1971, Bockstahler was appointed general manager of a new arm of the company known as chemicals and fibers division, which included the insulation plant in Joplin, Missouri. In that capacity, he oversaw division operations in research, production and marketing, including the asbestos-containing insulation products that were eliminated in August 1971. In the fall of 1981, he was relocated back to Cincinnati and served there until December 1987 as litigation assistant to the general counsel. In that capacity, he served as the company fact witness in litigation matters.

Bockstahler prepared a document around 1982 to show the amounts of chrysotile asbestos used by Eagle-Pitcher in its production processes and the suppliers of that asbestos. Bockstahler prepared the document from cost of production records found in the accounting department at the Joplin plant in Missouri. The cost of production records show the weight and amount of each ingredient for each product and are intended by the plant accountant to establish total cost not including overhead. Bockstahler stated that ACL was the sole supplier of chrysotile asbestos fiber to Eagle-Pitcher between 1935 and 1957. Throughout the 1940's and 1950's, the amount of asbestos supplied by ACL to Eagle-Pitcher peaked at 1227 tons in the war year of 1943, falling to 662 tons in 1956. Bockstahler stated that the processed asbestos supplied by ACL was used primarily in the manufacture of insulating cements. In fact, 95 percent of the asbestos was used in the manufacture of Eagle-Pitcher's "Cadillac" product, its Eagle Super 66 insulating cement.

DISCUSSION

A. *Personal Jurisdiction**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Arena v. Owens-Corning*

In *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178 [74 Cal.Rptr.2d 580] (*Arena*), Division One of this Court upheld a judgment against two asbestos suppliers, *one of which was ACL*, concluding among other things that raw asbestos is a product that may have a design defect, and that strict liability can apply to the supplier of a defective raw material. ACL submits that *Arena* was "wrongly decided" because (1) the court erred by holding that a raw material could be defectively designed; (2) the court erred by holding that the consumer expectations test applied to a raw material like asbestos; (3) the decision is "inconsistent" with case law governing the liability of bulk suppliers of raw materials to users of end products manufactured by others. ACL further asserts that the jury returned a verdict in favor of plaintiffs only because it was erroneously instructed under *Arena*. ACL contends that we should "revisit" *Arena*, overrule it, and hold that a supplier of raw asbestos is under no duty to provide warnings.[4] Having done that, ACL asserts that we should then

---

*See footnote, *ante,* page 651.

[4] Alternatively, ACL suggests we could "certify this issue to California's high court."

reverse the jury's finding of liability against ACL and dismiss "the plaintiffs' complaint as asserted against ACL."

We decline ACL's invitation to "revisit" and "overrule" *Arena*.[5] ACL simply offers us the same arguments that it presented to the court in *Arena*. All were rejected by the *Arena* court in its 1998 decision, and ACL points to no Court of Appeal decision since then disagreeing with the central tenets of *Arena*. Rather, ACL submits that *Arena* was "wrongly decided."

 First, ACL contends that the *Arena* court erred by holding that raw asbestos could be defectively "designed" because asbestos is "a natural immutable mineral," which does not "fit the analytical mold of products-liability principles." To the contrary, *Arena* held that strict liability applies to suppliers of raw asbestos because "incorporating raw asbestos into an insulation product does not substantially alter" the asbestos, and because strict liability is not "restricted to processed products."[6] (*Arena, supra,* 63 Cal.App.4th at pp. 1188–1189.) In this regard *Arena* is entirely consistent with the principles of California strict liability law governing the liability of component manufacturers, and ACL cites no California law to the contrary. (Cf. *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 479–480 [127 Cal.Rptr.2d 614, 58 P.3d 450] [noting that, "For purposes of strict products liability, there are 'no meaningful distinctions' between, on the one hand, component manufacturers and suppliers and, on the other hand, manufacturers and distributors of complete products; for both groups, the 'overriding policy considerations are the same.' [Citation.]"].)

Second, ACL contends that the *Arena* court erred by applying the consumer-expectations test to a raw material. ACL criticizes the *Arena* court for extending the holdings of *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461 [38 Cal.Rptr.2d 739] and *Morton v. Owens-Corning Fiberglas Corp.* (1995) 33 Cal.App.4th 1529 [40 Cal.Rptr.2d 22]—applying

---

[5] As a court of equal dignity, we are certainly free to disagree with our colleagues in Division One, and may even decline to follow them. However, principles of stare decisis do not permit us to "overrule" their decision in *Arena*. (*Cuccia v. Superior Court* (2007) 153 Cal.App.4th 347, 353–354 [62 Cal.Rptr.3d 796] [under principles of stare decisis only a court of superior jurisdiction may overrule courts exercising inferior jurisdiction, and noting that "[d]isagreements at the Court of Appeal level are common"].)

[6] ACL relies on language in *Mullen v. Armstrong World Industries, Inc.* (1988) 200 Cal.App.3d 250 [246 Cal.Rptr. 32], stating that " 'asbestos is not a "product," but rather a generic name for a family of minerals . . . .' " (*Id.* at p. 257, citation omitted.) The *Arena* court stated that ACL's reliance on this language "does not support its argument . . . [because] *Mullen* concerned only the applicability of the 'market share' theory to asbestos removal cases, and not the 'raw materials' issue." (*Arena, supra,* 63 Cal.App.4th at p. 1191, fn. 6.)

the consumer-expectations test to finished products—to a raw material like asbestos. In this regard, ACL asserts that "raw asbestos is no more 'designed' than is sodium . . . [or] lead," and asks rhetorically whether a company that provides chlorine gas should be held liable if a manufacturer uses it to produce defective bleach.

■ In *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990 [35 Cal.Rptr.3d 144], a panel of this division agreed with the *Arena* court that " '[t]he consumer expectations test asks if the reasonable minimum safety expectations of the product's ordinary consumers were violated.' " (*Id.* at p. 1001, citing *Arena, supra,* 63 Cal.App.4th at p. 1185.) And the *Arena* court specifically rejected ACL's "chlorine" analogy as a bar to the application of the consumer-expectations test to a product like asbestos. The court stated: "In *Jenkins* v. *T&N PLC* [(1996)] 45 Cal.App.4th 1224 [53 Cal.Rptr.2d 642], the court noted that raw asbestos fibers do not change when they become a component part of another asbestos product. This fact alone distinguishes asbestos from the sulfuric acid supplier's drain cleaning product in *Walker.* When used by defendant's tenant, the product exploded, injuring the plaintiff. (*Walker* v. *Stauffer Chemical Corp.* [(1971)] 19 Cal.App.3d 669, 671 [96 Cal.Rptr. 803].) The *Walker* court expressly stated: 'The compounding [of the drain cleaning product] entailed a change in the physical composition of the bulk acid calculated to render it suitable as a household product. The bulk sulfuric acid was substantially altered, not only as to its chemical composition, but as to the container form in which it was distributed.' [Citation.] For this reason, *Walker* refused to extend strict liability to the producer of a product that had been substantially changed. [Citation.] *Walker* belongs in the group of cases that involve *nondefective raw materials* or components supplied by the so-called upstream suppliers who have no control over alterations by the manufacturer of the final product. [Citations.] *Walker* does not provide the rule in this case *because incorporating raw asbestos into an insulation product does not substantially alter ACL's product.*" (*Arena, supra,* 63 Cal.App.4th at p. 1188, italics added.) We see no flaw in the *Arena* court's analysis.

Third, ACL contends that the *Arena* decision is "inconsistent" with case law governing the liability of bulk suppliers of raw materials to users of end products manufactured by others. ACL asserts that under this case law bulk suppliers of raw materials are not liable for end products manufactured by others and that "the duty to properly design, manufacture and test a product, and ultimately to provide appropriate warnings, is the responsibility of the manufacturer, not the supplier of the raw material ingredients."

On this point, ACL merely recycles the argument it made *ante*, because *Arena* acknowledged and approved those cases holding that a raw material supplier *is not liable* under strict liability where its raw material *has been substantially altered* during the manufacturing process of a finished product. (See *Arena, supra*, 63 Cal.App.3d at pp. 1188–1189.) Indeed, the principal California case relied upon by ACL is *Walker v. Stauffer Chemical, supra*, 19 Cal.App.3d 669. But as noted above, the *Arena* case specifically and logically distinguished *Walker* because the bulk raw material in that case—sulphuric acid—was substantially altered by the manufacturer to produce the drain cleaning product that injured the plaintiff. (*Arena, supra*, 63 Cal.App.3d at p. 1188.) In contrast, "incorporating raw asbestos into an insulation product does not substantially alter" the asbestos. (*Ibid.*)

ACL, however, asserts that *Walker* was followed by *Groll v. Shell Oil Co.* (1983) 148 Cal.App.3d 444 [196 Cal.Rptr. 52] (*Groll*), a case that predates and was not mentioned in *Arena*. In *Groll*, the sixteen-year-old plaintiff was injured in an explosion when he attempted to use a can of Park Ranger Stove and Lantern Fuel (BT-67) to light a woodburning fireplace in the bedroom of his residence. Through his guardian ad litem, plaintiff sued for damages against Chase Chemical (Chase), the distributor, Sports, Ltd., the distributor sales company, and the manufacturer of BT-67, Shell Oil Company. Plaintiff settled with Chase and Sports, Ltd., and proceeded to trial against Shell Oil. At the conclusion of plaintiff's case, the trial court granted Shell Oil's motion for nonsuit on the ground that it did not owe or breach a duty to the plaintiff. (*Groll, supra,* 148 Cal.App.3d at pp. 446–447.)

The Court of Appeal affirmed on two grounds. First, regarding the adequacy of the warnings Shell Oil and Chase provided with the BT-67, the court noted that "[a]ppellant had the burden of proving that the product was defective and that the defect was a proximate cause of his injuries. [Citation.] [Shell Oil's] data sheet warned Chase regarding the dangerous propensities of BT-67 and specifically advised avoiding 'excessive heat,' 'open flame,' and 'spark sources.' Chase warned appellant that BT-67 was 'extremely flammable' and should be kept away from 'heat' and 'open flame[s].' Thus appellant was injured, not as a result of inadequate warnings by [Shell Oil] or Chase, but rather, as a consequence of his own improper use of the product. After reading the label, appellant should have known that BT-67 should not be used to start a woodburning fire." (*Groll, supra,* 148 Cal.App.3d at p. 448.) Similarly, the court noted that a manufacturer's liability to the ultimate consumer may be extinguished by "intervening cause" where the manufacturer either provides adequate warnings to a middleman or the middleman alters the product before passing it to the final consumer. (*Id.* at pp. 448–449.) Thus, the

court concluded that since Shell Oil "manufactured and sold BT-67 in bulk, its responsibility must be absolved at such time as it provides adequate warnings to the distributor who subsequently packages, labels and markets the product." (*Id.* at p. 449.) This case is thus diametrically opposed to *Groll* because there is no evidence that ACL provided warnings to its purchasers of asbestos within the relevant timeframe, either on the 100-pound bags in which it was shipped or on any safety data materials shipped with the product as in *Groll*.[7]

Finally, just as it did in *Arena*, ACL relies on "out-of-state cases and [a comment in] a proposed draft of the Restatement Third of Torts" (*Arena, supra*, 63 Cal.App.4th at p. 1188). We need not discuss each of these out-of-state cases in detail. Most of them are inapposite because they involve application of the "bulk supplier defense" to suppliers of "unavoidably unsafe" products where those products are supplied in bulk to intermediaries either accompanied by proper directions and warnings or to sophisticated intermediaries who by training, experience, and instruction are familiar with the risks inherent in the use of the product. (See *Purvis v. PPG Industries, Inc.* (Ala. 1987) 502 So.2d 714, 718; *Rivers v. AT&T Technologies* (N.Y.Sup.Ct. 1990) 147 Misc.2d 366 [554 N.Y.S.2d 401, 404]; *Sara Lee Corp. v. Homasote Co.* (D.Md. 1989) 719 F.Supp. 417, 422–423.) Here by contrast, ACL was not a bulk supplier and there is no evidence either that ACL provided adequate warnings to its purchasers or that the purchaser identified in this case, Eagle-Pitcher, was aware of the dangers of asbestos. Last, to the extent that *Cimino v. Raymark Industries, Inc.* (5th Cir. 1998) 151 F.3d 297, 331 ("ordinary raw asbestos sold to a sophisticated and knowledgeable manufacturer of such products is not of itself defective or unreasonably dangerous" [applying Texas law]), conflicts with *Arena*, we decline to follow it.

C., D.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[7] The record shows that ACL placed warnings on its bags "since January 13, 1970" and that "in 1972, the label was revised to include particular language required by 29 C.F.R. section [1910].1001."

[*]See footnote, *ante*, page 651.

## DISPOSITION

The judgment is affirmed in all respects. ACL shall bear costs on appeal.

McGuiness, P. J., and Siggins, J., concurred.

A petition for a rehearing was denied April 21, 2008, and on April 2, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 11, 2008, S163372.