Filed 2/13/19 (unmodified opn. attached)

<strong>CERTIFIED FOR PUBLICATION</strong>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANGEL MARTINEZ,<br><br>    Defendant and Appellant. | B287255<br><br>(Los Angeles County<br>Super. Ct. No. NA095527)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING |

THE COURT:

It is ordered that the opinion filed on January 24, 2019, be modified as follows.

On page 33, the second sentence of the second paragraph is revised to read:

> Although we hold the section 1170.95 petition procedure is the avenue by which defendants with nonfinal sentences of the type specified in section 1170.95, subdivision (a) must pursue relief, we are cognizant of the possibility that some defendants may believe themselves able to present a particularly strong case for

relief under the changes worked by Senate Bill 1437 and wish to seek that relief immediately rather than await the full exhaustion of their rights to directly appeal their conviction.

On page 34, the second sentence is revised to read:

A Court of Appeal presented with such a stay request and convinced it is supported by good cause can order the pending appeal stayed with a limited remand to the trial court for the sole purpose of permitting the trial court to rule on a petition under section 1170.95.

Respondent's petition for rehearing is denied. There is no change in judgment.

_____
BAKER, Acting P. J.          KIM, J.          JASKOL, J.*

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 1/24/19 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B287255 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA095527) |
| v. | |
| JOSE ANGEL MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opening paragraph, Part II.C, and the disposition section of this opinion are certified for publication.

Attorney General, Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

When Los Angeles County firefighters responded to a call of an SUV on fire, they discovered a dead body in the back of the burning vehicle. The body was identified as the late Christopher Waters (Waters), and two high-school seniors, defendant and appellant Jose Angel Martinez (defendant) and Adrian Berumen (Berumen) were arrested and charged with Waters' murder. A jury found defendant guilty of first degree murder and arson.[1] In the unpublished portion of our opinion we decide two instructional error claims defendant raises in his principal briefs on appeal: (1) whether the trial court prejudicially erred in giving the jury self-defense instructions based on pre-trial statements defendant made to investigators even though, at trial, defendant did not ask for self-defense instructions and did not assert, when testifying, that he acted in self-defense; and (2) whether the trial court should have given a lesser related offense instruction absent the prosecution's concurrence. In the published portion of our opinion, we decide the issue defendant raises in supplemental briefing, namely, whether on direct appeal he can avail himself of the ameliorative benefits of Senate Bill 1437, which changes the law on what mental state is required to be guilty of murder.

**[Parts I, II.A, and II.B, below, are deleted from publication. See *post* at p. 23 for where publication is to resume.]**

_____

[1]     The criminal proceedings against Berumen are not before us in this appeal.

## I.  BACKGROUND

The Los Angeles County District Attorney charged defendant with one count of murder, in violation of Penal Code section 187, subdivision (a),[2] and one count of arson of property of another, in violation of section 451, subdivision (d).  At trial on these charges, the prosecution called more than twenty witnesses and defendant put on a defense case—including testifying on his own behalf.  We summarize the key evidence pertinent to the issues raised on appeal.

### A.     *Events Leading Up to the Murder*

In April 2013, defendant was a senior in high school and considered Berumen his best friend.  Berumen did some work at a screen printing shop called Top Hat Screen and Design.  The murder victim, Waters, had also done some t-shirt printing work at the shop, including for Berumen.

Two days before the murder, on April 21, 2013, Berumen exchanged text messages and phone calls with Waters.[3]  The text messages concerned an apartment Waters might want to lease.  Berumen and Waters made tentative plans to meet a couple days later, on Tuesday, April 23.  Toward the end of their exchange, Berumen wrote, "I will hyu [hit you up] monday night to see where we are at from there bruh."

---

[2]     Undesignated statutory references that follow are to the Penal Code.

[3]     A cell phone extraction report indicated Berumen attempted to delete many of the text messages recovered from his phone and introduced in evidence at trial.

4

Berumen continued to communicate with Waters the next day, sending him a text message asking if he would want to see "that apartment" on Tuesday. Later that night, Berumen sent a text message to an individual identified as "Marcos Baby" in his phone, saying, "[I]mma gank[4] that nigguh tommarow but I gotta show him $50 for him to co[m]e." That same night, Berumen was also exchanging phone calls and text messages with defendant.

In the morning on the day of the murder, April 23, 2013, the owner of the Top Hat screen printing business saw Waters at the shop packing up boxes for delivery. Waters then delivered a t-shirt order to a customer. He was paid in cash and seemed normal when he delivered the shirts. The customer sent Waters a follow-up text message later in the day, but she never received a response.

Defendant and Berumen exchanged calls and text messages that same morning. Cell phone location evidence indicated defendant was in Long Beach, where Berumen resided, by around 8 a.m. Berumen also exchanged text messages with Waters, ending with a text at about 10:21 a.m. in which Berumen told Waters, "Let me [know] when you[']re out front."

Cell phone location evidence put defendant in San Pedro by about 2:00 p.m. on April 23. Not long thereafter, Anne Albritton (Albritton) was walking along First Street near her home when she encountered two "young teen adults" walking "in a fast manner." Albritton stopped and spoke to the young men. The

_____

[4]     At trial, a Los Angeles County Sheriff's Department detective testified "gank" meant to rob or steal something from someone.

5

larger and heavier of the two[5] told her a car was on fire up the street.  When Albritton asked them if they had called 911, the larger man said yes.  He asked Albritton what city they were in, and she told them they were in San Pedro.  The larger boy appeared "very amped up, pumped up, very animated and excited and joyful."  The smaller and thinner boy remained silent.  At some point during their interaction, Albritton called 911.

A taxi driver received a call for a pickup on First Street in San Pedro at around 3:00 p.m.  When he arrived, he could not immediately locate the callers, but he was flagged down by two young Hispanic men.  The driver spoke to his passengers about high school and their t-shirt business.  Per their request, he dropped them off in front of the Lakewood Mall.  Security footage from the mall showed defendant and Berumen at the location from about 3:19 p.m. to 3:49 p.m. on April 23.

### B.   Law Enforcement Investigation and Waters' Autopsy

The Los Angeles County Fire Department responded to a call regarding a vehicle fire at approximately 2:17 p.m. on April 23.  When firefighters arrived at the scene, they found an SUV in flames.  The SUV was parked on a basketball court surrounded by a chain link fence.  After firefighters extinguished the fire, they discovered a body, later identified as Waters, in the rear cargo area of the vehicle and contacted the Sheriff's Department.

---

[5]   Albritton did not identify defendant or Berumen in court. A law enforcement officer testified to defendant and Berumen's height and weight, indicating Berumen was taller and heavier than defendant.

Los Angeles County Sheriff's Department Lieutenant Scott Hoglund responded to the scene and took charge of the investigation. Viewing Waters' body in the SUV, Hoglund saw his ankles were bound and he was wrapped in a comforter. An electric cord was wrapped tightly around his neck multiple times.

As Waters' body was being removed from the SUV, a supervising criminalist with the Los Angeles County Coroner's Office and detectives on the scene removed items from the back of the vehicle. In addition to fire debris, they discovered clothing and a miniature wooden baseball bat. Some of the debris in the car had an odor of ignitable liquid, which later testing revealed to be gasoline. A deputy sheriff also found a sock, a matchbook, and a license plate lying on the ground. The license plate, which was discovered below the SUV's rear bumper, indicated the vehicle belonged to Waters.

A medical examiner at the Los Angeles County Coroner's Office supervised the autopsy of Waters' body. Waters had two black eyes, a broken nose, a laceration of the left nostril indicating blunt force to the area, swelling and bleeding of the lips with multiple lacerations, and extensive bruising on the forehead on both sides of the temple. The medical examiner concluded the injuries were caused by moderately severe blunt force, applied by multiple blows while Waters was still alive. The examiner further concluded the blunt force trauma could have been caused by a combination of hits by a small baseball bat and fists. There were no other injuries or bruising to Waters' stomach, back, or torso. There was no bruising on his arms, forearms, hands, nor were there any injuries consistent with defensive wounds. The ultimate cause of death was strangulation, and Waters was dead before the fire started. An

arson and bomb investigator for the Los Angeles Sheriff's Department reviewed the case and concluded it was a "body dump," meaning Waters had been killed elsewhere and transported to the scene, where the vehicle and body were torched with the use of gasoline and an open flame.

Lieutenant Hoglund determined Berumen was a person of interest in the investigation after obtaining Waters' cell phone data and speaking to a school resource officer at the high school that both Berumen and defendant attended. Lieutenant Hoglund sent a surveillance team to Berumen's home. The next day, Berumen went to the Long Beach police station and asked to speak to investigators about Waters' murder.

Lieutenant Hoglund and Detective Adrian Garcia of the Long Beach Police Department interviewed Berumen with his mother present. Berumen did not have any visible injuries and did not report any pain or otherwise indicate he had been injured. After the interview, Lieutenant Hoglund obtained a warrant to search Berumen's home. Law enforcement officers executing the search warrant discovered bloodstains in several areas of the garage, which appeared to be used as a living quarters. A blood sample collected at the scene was a probabilistic match to Waters' DNA profile.

C.    *Identification and Interview of Defendant*

During his investigation, Lieutenant Hoglund obtained surveillance footage from the Lakewood Mall. He took a still frame from the footage and a photograph from a Facebook post to the school resource officer at defendant's high school. The resource officer identified defendant as one of the two young men in the photo. Lieutenant Hoglund then sent a surveillance team

8

to defendant's home. They made contact with defendant and asked if he would speak with Lieutenant Hoglund. Defendant agreed.

Lieutenant Hoglund and another detective interviewed defendant at the police station. Defendant initially said he had nothing to do with Waters' death or the attack. Defendant did acknowledge he stopped by Berumen's home the morning of the murder but he claimed he was only there a short while before heading to school, where he stayed until about 1:40 p.m. When asked why he had been at Lakewood Mall with Berumen the afternoon of the murder, defendant said he went to the mall after school and paid for certain items he purchased with $200 Berumen had given him the day before.

The interviewing officers told defendant they knew he and Berumen had been picked up by a taxi in San Pedro and dropped off at the mall, and asked defendant to start from the beginning and tell the truth. Defendant then related a significantly different sequence of events. Defendant said he was at Berumen's house in the garage "listening to music[ and] watching videos" when Waters arrived. Berumen owed Waters money for some designs and did not have the money to pay him. At some point after Waters arrived, Berumen went into the house. Waters then "started going crazy" and "started trying to fight" defendant. Berumen returned to the garage and he and defendant "beat [Waters] up badly."

During the attack, defendant hit Waters with his fists. Defendant kept beating Waters after he went down because he did not want Waters to get back up and retaliate. Berumen put an extension cord around Waters' neck because he did not want him to move. While they were cleaning the room after beating

9

Waters, defendant put a blanket over Waters' face. Waters "was unconscious" when defendant did so, and defendant "had a feeling" Waters was dead.

After beating Waters, defendant took a shower and put on some of Berumen's clothes. Defendant and Berumen decided to burn Waters' body because they did not know what to do, did not want to get caught, and thought they would not be found if they burned everything. Berumen and defendant picked up Waters, put him in the back of his SUV, and covered him with the blankets they used to clean the room. Defendant threw his soiled clothes in the car as well.

Berumen drove defendant around San Pedro with Waters' body in the car. They stopped at a gas station to buy a gas can and gas, and they continued driving until they arrived at the basketball courts. They stopped because it looked like no one was there and put gas inside and outside the car. Defendant walked away and told Berumen to hurry up because cars were coming. Berumen set the car on fire and the two walked down the street.

Defendant told the interviewing officers that he and Berumen encountered a woman while walking away from the scene. She said hello and they tried to "play it off," asking if she had seen the fire. When asked if they had called 911, they said yes. Defendant and Berumen continued walking, and then Berumen called a cab and they went to the Lakewood mall. Berumen gave defendant $200 out of approximately $1000 he had taken from Waters. Defendant did not have any injuries other than partially skinned knuckles.

*D.    The Defense Case*

Defendant testified at trial in his own defense; his testimony diverged greatly from the account he related to Lieutenant Hoglund.

Defendant testified he was not required to attend school on the day of the murder because he was a senior and the school was conducting placement tests for other students.  Defendant went to Berumen's home to hang out until the school day was over.  He did not know Waters was going to be at Berumen's house until that morning.  Defendant knew Waters from the Top Hat shop but did not know him well.

When Waters arrived, everything seemed "regular," and the three talked about music and watched music videos.  At some point, Waters pulled out his wallet and started counting his money.  Defendant testified Berumen then suddenly grabbed a bat and began hitting Waters in the face.  Berumen kept hitting Waters after he hit the ground, hitting him until the bat snapped and Waters was unconscious.  Defendant did not think Waters could defend himself because the first hit caught him off guard.  When Berumen started hitting Waters, defendant got up and backed up.  He turned away at some point because there was a lot of blood.  Defendant "just got stuck" and did not know how to react.

Berumen started barking orders at defendant, telling him to help clean up the blood.  Defendant did as he was told and helped Berumen clean.  It did not occur to defendant to leave, and defendant put a rag over Waters' face while he was cleaning.  Waters was unconscious and defendant thought he was dead.  As defendant was cleaning, Berumen grabbed a cord and tied it around Waters' neck.  Berumen then went out to Waters' SUV

11

and backed it into the garage. They loaded Waters' body into the back and then each took a shower. Defendant borrowed clothes from Berumen and put his clothes on top of Waters' body.

Berumen got into the driver's seat, defendant got into the passenger seat, and they drove off. Defendant did not direct Berumen to go anywhere. Berumen got on a freeway and drove for around thirty to forty-five minutes. They were not talking, but when Berumen asked defendant if he was alright, defendant said he was. Once they got off the freeway, they stopped at a gas station and defendant bought a gas can and some gas with money Berumen gave him because Berumen told him to do so. Defendant was following Berumen's orders because he seemed to know what he was doing and defendant was scared.

After defendant bought the gas, Berumen kept driving and they eventually arrived at the location with the basketball courts. Berumen started pouring gas on the engine. Defendant got out of the SUV, and Berumen started pouring gas inside the vehicle. By this time, defendant had reached his "breaking point" and told Berumen he had to leave. Berumen lit the car on fire as defendant was walking away.

Defendant and Berumen encountered a woman while walking away from the burning vehicle. Berumen called a cab and they went to the Lakewood Mall so defendant could buy clothes similar to what he was wearing earlier that day (he did not want his father to realize he had gone somewhere other than school). After defendant bought the clothes, he called a friend who picked them up, dropped Berumen off at his house, and took defendant home.

When confronted with the statement he had given to investigators at the police station, defendant testified he lied

12

during his police interview.  He claimed he lied to the police because he panicked, explaining he knew he had helped Berumen with the body and the first thing he thought of was saying he had been defending himself.  So defendant told the detective that Waters was trying to fight him and he and Berumen were both hitting Waters in order to show he was trying to defend himself.  Defendant testified that, in truth, he never hit Waters, never came into physical contact with Waters before putting him in the truck, and never suffered any injury during the killing.

Also testifying on defendant's behalf was Danielle Sawyer, one of his high school teachers.  Sawyer testified she taught defendant for his first three years of high school.  She had no knowledge of defendant being involved in any fights at school and she believed he was a person who would avoid conflict if he could.

### E.    Jury Instructions

Outside the presence of the jury, defense counsel asked the court to instruct the jury on the lesser related (not lesser included) offense of being an accessory after the fact based on defendant's testimony that he assisted in the cleanup and cover-up but not the murder.  The trial court declined, reasoning that the crime of being an accessory after the fact was not a lesser included offense and the jury could not come back with a finding on that ground.  Rather, it would need to find defendant either guilty or not guilty of the charged crimes of murder and arson.  Defendant requested the court give the accessory instruction as a separate count.  The court again stated it could not give such an instruction because it was not a lesser included offense.  The trial court asked the prosecution if it wanted to be heard on the issue, and the response was "no."

13

As the court began instructing the jury on justifiable homicide in self-defense, defense counsel interrupted and asked to approach. Outside the hearing of the jury, defense counsel asked the court to withdraw the self-defense instructions. Counsel said the court might have a sua sponte duty to so instruct the jury but emphasized defendant had disclaimed having acted in self-defense during his trial testimony. The trial court declined to withdraw the instructions on self-defense principles, explaining: "[T]he reason I'm giving [the instruction] is that the jurors have some decisions to make. [¶] They can find that your client was truthful on the stand and not guilty of the murder. They can find that your client was not truthful on the stand, but they could believe the statement that he gave to the detective that there was self-defense. [¶] Or they could find [the prosecution's] theory under a number of different theories. [¶] I don't think that I can withhold these instructions. I think I have to give it because of the statement that was introduced that would allow the jurors to come back with a self-defense verdict." The prosecutor agreed, stating he thought the instruction had to be given based on what was in evidence.

The trial court gave the jury self-defense instructions as planned, including instructions on justifiable homicide and the limits of the right of self-defense. During the prosecution's closing argument, the prosecutor argued defendant could not have been acting in self-defense because Waters did not have any wounds on his hands or any defensive wounds. During the defense closing argument, counsel made no reference to defendant having acted in self-defense. Instead, the defense argument was that Berumen alone perpetrated the killing, unbeknownst to defendant in advance, and all defendant did was

14

help Berumen cover it up—which was not enough to be guilty of the murder itself.

### F.   *Verdict and Sentencing*

The jury found defendant guilty of murder in the first degree and arson of the property of another. The trial court sentenced defendant to twenty-five years to life in prison on the murder count. The court further imposed a high-term three-year prison term for the arson conviction, comprising a total aggregate sentence of twenty-eight years to life.

## II.  DISCUSSION

Defendant argues the trial court erred by instructing the jury on self-defense and by declining to give the jury instructions on the lesser-related offense of being an accessory after the fact. Although we can understand why the trial court thought it should instruct on self-defense in light of defendant's police interview statements, it was error to give self-defense instructions that defendant did not request and that were contrary to his theory of the case at trial. The error, however, was harmless because the self-defense instructions the court gave did not contribute to the verdict obtained, particularly in light of (a) other instructions given by the trial court that warned the jury of the possibility that not all of the instructions were necessarily applicable, and (b) the absence of any reference to self-defense in the defense closing argument. As for defendant's contention that the court should have instructed on the lesser related offense of being an accessory after the fact, the trial court did not err when it declined to give such an instruction in the

absence of the prosecution's consent, as binding authority holds (*People v. Birks* (1998) 19 Cal.4th 108 (*Birks*)).

Defendant additionally argues he is now entitled to the ameliorative benefits of the recently enacted Senate Bill 1437. Senate Bill 1437 made statutory changes altering the definitions of malice and first and second degree murder.  The legislation also established a procedure by which defendant and others who have sustained a murder conviction that arguably rests on a felony murder or a natural and probable consequences theory of liability may petition the sentencing court to hear additional evidence and, if appropriate, vacate the murder conviction if inconsistent with now-governing law.  Notwithstanding the enactment of this procedure for retroactive relief, defendant argues he should be able to avail himself of the ameliorative benefits of Senate Bill 1437 on direct appeal.  We hold to the contrary, concluding the Legislature's enactment of the petitioning procedure evinces an intent to limit retroactive application of Senate Bill 1437.  Defendant may seek Senate Bill 1437 relief, but he must do so via the procedural avenue provided by the legislation, which will permit the trial court to take additional evidence that may bear on defendant's liability for murder.

### A.     The Self-Defense Instruction

""""It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence"' and "'necessary for the jury's understanding of the case.'" [Citations.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 73 (*Brooks*).)  "'That obligation has been held to include giving instructions on lesser included

offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.]'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155 (*Breverman*).)

Though a sua sponte instructional duty can also extend to defenses, the duty there is more circumscribed. (See, e.g., *People v. Barton* (1995) 12 Cal.4th 186, 197 ["requir[ing] trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant"]; *People v. Sedeno* (1974) 10 Cal.3d 703, 715-716, overruled in part on other grounds.) A trial court only has a sua sponte duty to instruct on a defense "'if it appears . . . the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*Brooks, supra*, 3 Cal.5th at p. 73; see also *People v. Maury* (2003) 30 Cal.4th 342, 424.) Where "the trial court believes 'there is substantial evidence that would support a *defense* inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory.'" (*Breverman, supra*, 19 Cal.4th at p. 157; see also *People v. De La Plane* (1979) 88 Cal.App.3d 223, 248-249.) "[A] trial court should not instruct the jury on an inconsistent affirmative

17

defense over the defendant's objection." (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1168 (*Jo*).)

The record demonstrates defendant was not relying on self-defense as a defense at trial. During his trial testimony, defendant expressly disavowed a self-defense theory, stating he lied to the detectives when he claimed he was acting in self-defense because he was "scared." In his view, he was minimally involved in the murder—only as an accessory after the fact.

The Attorney General sees the record differently, contending self-defense was not inconsistent with defendant's theory of the case because it was "[defendant's] own actions in telling inconsistent versions of what had happened [that] required him to acknowledge, if only inferentially, the existence of facts which he otherwise denied at trial . . . ." The source of the inconsistency at trial (between defendant's statements to the police and his trial testimony) is immaterial, however; it is the *existence* of the inconsistency that is important. Defendant elected to defend at trial by disavowing his statement to investigators and by claiming he participated in the killing only by helping to cover it up after the fact. Once he made that election, the trial court had no sua sponte obligation to instruct on self-defense and should have refrained from doing so when defense counsel expressed (albeit rather belatedly) that he did not want such instructions. (*Breverman*, *supra*, 19 Cal.4th at p. 157; see also *Jo*, *supra*, 15 Cal.App.5th at pp. 1168-1169.)

Although we conclude the trial court erred in instructing on self-defense over defendant's objection, this is not the end of our inquiry. We must also decide if the error was prejudicial. In doing so, we examine the entire record, including the facts,

18

instructions, and arguments of counsel. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

The parties disagree as to what standard governs our prejudice inquiry. In reviewing cases involving a failure to instruct on a sua sponte defense, our high court has assumed the more rigorous *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) harmless beyond a reasonable doubt standard applies. (E.g., *People v. Salas* (2006) 37 Cal.4th 967, 984.) Assuming that *Chapman* standard applies in this case, we conclude the inclusion of the instruction was harmless beyond a reasonable doubt.

"""In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given."" [Citation.]" (*Jo*, *supra*, 15 Cal.App.5th at p. 1172.) Here, the jury was instructed that "[t]he purpose of the court's instructions is to provide [the jury] with the applicable law so that you may arrive at a just and lawful verdict. Whether some instructions apply will depend upon what you [the jury] find to be the facts." Importantly, the jurors were also instructed to "[d]isregard any instruction which applies to facts determined by you not to exist" and "not [to] conclude that because an instruction has been given [the court is] expressing an opinion as to the facts." Further, the jury was instructed that "[n]o person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any confession or admission made by him outside of this trial." "We presume the jury understood and followed the court's instructions." (*People v. Jackson* (2016) 1 Cal.5th 269, 352.)

19

Any juror inclined to credit defendant's trial testimony would have followed these instructions and simply disregarded the court's self-defense instructions, particularly since (1) the defense did not rely on a self-defense theory in closing argument (indeed, the defense made no reference to self-defense at all), and (2) there was no evidence indicating Waters had sustained injuries to any part of his body other than his face and head prior to his death.

Defendant, however, argues there are "legitimate reasons" for suspecting the jurors might have disregarded the letter of the instructions and condemned defendant's behavior, even if they did not believe the evidence demonstrated defendant had committed murder. Essentially, defendant argues the jury would have found his behavior in assisting with the attempted cover-up so reprehensible that the jury would have convicted him of murder even if it believed he did not participate in Waters' murder. This is ungrounded speculation. We presume, and there is no record-based reason to conclude otherwise, that the jury followed CALJIC Nos. 2.90 and 8.10, the instructions requiring them to find each element of the charged crime beyond a reasonable doubt.

The remainder of defendant's efforts to establish prejudice from any error in giving self-defense instructions are equally unpersuasive. First, defendant argues the trial court's instructions on self-defense undermined his testimony and defense at trial because they demonstrated the self-defense story he told the police could not have been intentionally falsified; as he argues it, the instructions revealed his self-defense story fell woefully short of establishing the legal elements of self-defense. The jury, however, did not need to believe defendant was a

20

criminal law scholar such that the story he told during his police interview would *actually* have been sufficient to make out a self-defense defense. To credit his trial testimony, the jury at most needed to conclude that defendant *believed* his story would establish a viable self-defense claim, and lied to the investigators because of that belief. Second, defendant argues the jury would have assumed defendant requested the self-defense instructions even though no version of the facts shown by the evidence could support it. Again, this is groundless speculation. Defendant did not argue for self-defense at any point during the trial, and he in fact disavowed his previous statement given to investigators. There was no reason for the jury to assume he was the one who asked the court to give self-defense instructions.

### B. *The Trial Court Did Not Err in Declining to Give a Lesser Related Offense Instruction*

"[A]ccessory after the fact is, as the court noted, a lesser related offense to murder, not a lesser included offense." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 486.) Our Supreme Court has held a trial court is not obliged to instruct a jury on lesser related offenses even if requested. (*Birks*, *supra*,19 Cal.4th at pp. 112-113.) Indeed, it is not *allowed* to do so unless both the prosecution and the defendant consent to the instruction. (*Ibid.*)

Defendant seeks to avoid the binding force of *Birks* for three reasons, none of which is persuasive.

First, defendant contends the prosecution impliedly consented to the requested instruction by not affirmatively objecting to or opposing the request for the instruction. Nothing in controlling case law, however, suggests some notion of implied consent is sufficient to instruct on a lesser related offense.

21

Rather, the discussion in *Birks* (which encompassed separation of powers principles) is correctly read to hold that an instruction on a nonincluded offense may be given only when the prosecution affirmatively agrees (*Birks*, *supra*, 19 Cal.4th at pp. 132-136), and here, there was no such agreement.  In any event, the record does not support the view that the prosecution impliedly consented.  After defense counsel requested the accessory after the fact instruction, the trial court stated it could not give the instruction because accessory after the fact was a lesser related, not a lesser included, offense.  It was only at that point that the prosecution declined when asked if it wanted to be heard.  With rejection of the request for an accessory instruction already a fait accompli, the prosecution's silence is, if anything, an implied objection to such an instruction, not implied consent.

Second, defendant contends *Birks*'s policy arguments are inapplicable in this case because the concern with fairness to the prosecution had effectively been addressed by the time the defense requested the instruction at issue.  This argument fails because *Birks* did not condition the application of its holding to situations involving identical policy concerns.

Third, defendant argues he had a federal constitutional right to instruction on his theory because refusal of the instruction implicated his rights to trial by jury and due process.  To the contrary, both the United States Supreme Court and our Supreme Court have stated there is no constitutional obligation to instruct on a lesser related offense.  (*Hopkins v. Reeves* (1998) 524 U.S. 88, 97; *Birks*, *supra*, 19 Cal.4th at p. 124.)

We decline defendant's invitation to question *Birks*, which is controlling law, and we need not address the remainder of his arguments on this point.

**[The remainder of the opinion is to be published.]**

C.     *Senate Bill 1437*

On September 30, 2018, while defendant's appeal was pending, the Governor signed Senate Bill 1437.  The legislation, which became effective on January 1, 2019, addresses certain aspects of California law regarding felony murder and the natural and probable consequences doctrine by amending sections 188 and 189, as well as by adding section 1170.95, which provides a procedure by which those convicted of murder can seek retroactive relief if the changes in law would affect their previously sustained convictions.  (Stats. 2018, ch. 1015, §§ 2-4.)  Defendant requested the opportunity to submit supplemental briefing on the effect of Senate Bill 1437 and we received supplemental briefs from both sides.

1.     *Pertinent provisions*

Senate Bill 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)  Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability.  Senate Bill 1437 also adds the aforementioned section 1170.95, which allows those "convicted of felony murder or murder under a natural and

probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . ."  (§ 1170.95, subd. (a).)

An offender may file a petition under section 1170.95 where all three of the following conditions are met:  "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1170.95, subd. (a)(1)-(3).)

Pursuant to section 1170.95, subdivision (c), the petition shall include, among other things, a declaration by the petitioner stating he or she is eligible for relief based on all three aforementioned requirements of subdivision (a).  A trial court that receives a petition under section 1170.95 "shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section."  (§ 1170.95, subd. (c).)  If the petitioner has made such a showing, the trial court "shall issue an order to show cause."  (§ 1170.95, subd. (c).)

The trial court must then hold a hearing "to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been

24

sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).) "The parties may waive a resentencing hearing and stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing. If there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." (§ 1170.95, subd. (d)(2).) Significantly, if a hearing is held, "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).) "[T]he burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1170.95, subd. (d)(3).)

Section 1170.95, subdivision (f) states: "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner."

### 2. *Retroactivity of Senate Bill 1437*

The information filed against defendant charged him with murder under section 187, subdivision (a). Among the instructions given to the jury were instructions that allowed the jury to convict defendant of first degree murder pursuant to either a felony murder theory or the natural and probable consequences doctrine, as both were defined prior to the effective

25

date of Senate Bill 1437. Defendant was convicted of first degree murder.

Defendant contends Senate Bill 1437 applies retroactively to him, he argues retroactive application of the amended law means the trial court advised the jury incorrectly on the elements of murder, and he asks us to reverse his conviction and remand for a new trial. Defendant relies on retroactivity principles espoused in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) to assert he need not file a petition under section 1170.95 because his conviction is not yet final. The Attorney General, by contrast, argues defendant must proceed only by way of a petition pursuant to section 1170.95 and cannot circumvent that process by seeking retroactive relief in this appeal. The Attorney General has the better argument.

Our Supreme Court recently summarized the principles articulated in *Estrada, supra,* 63 Cal.2d 740: "'[A]n amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date' (*People v. Floyd* (2003) 31 Cal.4th 179, 184[ ], citing *Estrada*, at p. 744), unless the enacting body 'clearly signals its intent to make the amendment prospective, by the inclusion of either an express saving clause or its equivalent' (*People v. Nasalga* (1996) 12 Cal.4th 784, 793[ ]; see *Estrada*, at p. 747). This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the 'former penalty was too severe' (*Estrada*, at p. 745) and therefore 'must have intended that the new statute imposing the new lighter penalty . . . should apply to every case to which it constitutionally could apply' (*ibid*.)." (*People v. DeHoyos* (2018) 4 Cal.5th 594, 600 (*DeHoyos*).)

Two recent California Supreme Court opinions in circumstances analogous to those here point the way to the proper resolution of whether Senate Bill 1437 should be given retroactive effect on direct appeal notwithstanding the bill's enactment of the section 1170.95 petitioning procedure.

In *People v. Conley* (2016) 63 Cal.4th 646 (*Conley*), our Supreme Court considered whether *Estrada*'s holding compelled a conclusion that the Three Strikes Reform Act of 2012, commonly known as Proposition 36, applied retroactively to defendants whose judgments were not yet final. (*Id.* at pp. 655-656.) The defendant in *Conley* had been sentenced to an indeterminate term of 25 years to life under the Three Strikes law. Voters passed Proposition 36 while his appeal was pending (*id.* at pp. 654-655), and the initiative reduced the penalty for some third strike offenders whose third strike was not a serious or violent felony (*id.* at p. 652). Proposition 36 also created a post-conviction procedure that allowed prisoners who were already serving indeterminate life terms to seek resentencing for offenses that, if committed after the act's effective date, would no longer support life terms. (§ 1170.126, subd. (b).)

The defendant in *Conley* argued he was entitled to rely on *Estrada*'s retroactivity rule, which would enable him to seek Proposition 36 relief without complying with the initiative's petition procedure. (*Conley*, *supra*, 63 Cal.4th at pp. 654-655.) That procedure, among other things, gives trial judges discretion to withhold Proposition 36 relief if a judge finds that resentencing the petitioner would pose an unreasonable risk of danger to public safety. (*Ibid.*; § 1170.126, subd. (f).)

Our Supreme Court rejected defendant Conley's argument and held the post-conviction procedure provided by section

27

1170.126 was the exclusive means by which those who had been sentenced before Proposition 36's effective date could seek relief under the new law. (*Conley*, *supra*, 63 Cal.4th at pp. 661-662.) The Court acknowledged the continuing vitality of the *Estrada* rule in the unremarkable case of an ameliorative statute silent on whether it applies retroactively, but the Supreme Court concluded Conley was not entitled, on direct appeal, to invoke Proposition 36's changes to prior law for three principal reasons.

First, Proposition 36 was "not silent on the question of retroactivity" but instead "expressly addresse[d] the question in section 1170.126, the sole purpose of which is to extend the benefits of [Proposition 36] retroactively." (*Conley*, *supra*, 63 Cal.4th at p. 657.) In doing so, Proposition 36 did not distinguish between persons serving final sentences and those serving nonfinal sentences. (*Ibid.*)

Second, Proposition 36 made resentencing contingent on a court's evaluation of a defendant's dangerousness. Conferring an automatic entitlement to resentencing on defendants whose cases were still pending on direct appeal would not allow courts to conduct that inquiry, and the court found no basis to hold the electorate intended "for courts to bypass the public safety inquiry altogether in the case of defendants serving sentences that are not yet final." (*Conley*, *supra*, 63 Cal.4th at pp. 658-659.)

Third, the changes in law worked by Proposition 36 not only reduced previously prescribed criminal penalties but also established "a new set of disqualifying factors that preclude a third strike defendant from receiving a second strike sentence," factors that the prosecution was required to plead and prove. (*Conley*, *supra*, 63 Cal.4th at p. 659.) Because Proposition 36 did not address the complexities involved in applying the pleading-

28

and-proof requirements to previously sentenced defendants, the court concluded the electorate did not contemplate those provisions would apply to previously sentenced defendants. (*Id.* at pp. 660-661.) Rather, they intended such defendants to seek relief under section 1170.126, which did not contain pleading-and-proof requirements.

Our Supreme Court reached a similar result in *DeHoyos*, *supra*, 4 Cal.5th 594, which presented the question of whether Proposition 47 ("the Safe Neighborhoods and Schools Act") applied retroactively to nonfinal cases on direct appeal. "Proposition 47 redefined several common theft- and drug-related felonies as either misdemeanors or felonies" and enacted a petitioning procedure similar to that enacted as part of Proposition 36. (*Id.* at p. 597.) The *DeHoyos* court noted Proposition 47, like Proposition 36, was "an ameliorative criminal law measure that is 'not silent on the question of retroactivity,' but instead contain[ed] a detailed set of provisions designed to extend the statute's benefits retroactively." (*Id.* at p. 603.) Those provisions included a recall of sentence petitioning mechanism for individuals "serving a sentence" for a covered offense as of Proposition 47's effective date. (§ 1170.18, subd. (a).)

As it did in *Conley* when analyzing Proposition 36, the *DeHoyos* court found it significant that Proposition 47's recall of sentence petitioning mechanism drew "no express distinction between persons serving final sentences and those serving nonfinal sentences, instead entitling both categories of prisoners to petition courts for recall of sentence" and "expressly ma[king] resentencing dependent on a court's assessment of the likelihood that a defendant's early release will pose a risk to public safety, undermining the idea that voters 'categorically determined that

29

"imposition of a lesser punishment" will in all cases "sufficiently serve the public interest."'" (*Conley*, [*supra*, 63 Cal.4th] at p. 658; see § 1170.18, subd. (b).)" (*DeHoyos*, *supra*, 4 Cal.5th at p. 603.) The *DeHoyos* court acknowledged Proposition 47 differed from Proposition 36 in that it did not "create new sentencing factors that the prosecution must 'plead[ ] and prove[ ]' ([ ]§ 1170.12, subd. (c)(2)(C)) to preclude a grant of leniency." (*Ibid*.) The Court explained, however, that other indicia of legislative intent, including Proposition 47's broad statement of purpose, revealed the initiative's petitioning procedure was meant to be the exclusive avenue for retroactive relief for all previously sentenced defendants, whether or not their sentences were final. (*Ibid*.)

The analytical framework animating the decisions in *Conley* and *DeHoyos* is equally applicable here. Like Propositions 36 and 47, Senate Bill 1437 is not silent on the question of retroactivity. Rather, it provides retroactivity rules in section 1170.95. The petitioning procedure specified in that section applies to persons who have been convicted of felony murder or murder under a natural and probable consequences theory. It creates a special mechanism that allows those persons to file a petition in the sentencing court seeking vacatur of their conviction and resentencing. In doing so, section 1170.95 does not distinguish between persons whose sentences are final and those whose sentences are not. That the Legislature specifically created this mechanism, which facially applies to both final and nonfinal convictions, is a significant indication Senate Bill 1437 should not be applied retroactively to nonfinal convictions on direct appeal.

The remainder of the procedure outlined in section 1170.95 underscores the Legislative intent to require those who seek

30

retroactive relief to proceed by way of that statutorily specified procedure. The statute requires a petitioner to submit a declaration stating he or she is eligible for relief based on the criteria in section 1170.95, subdivision (a). (§ 1170.95, subd. (b)(1)(A).) Where the prosecution does not stipulate to vacating the conviction and resentencing the petitioner, it has the opportunity to present new and additional evidence to demonstrate the petitioner is not entitled to resentencing. (§ 1170.95, subd. (d)(3).) The petitioner, too, has the opportunity to present new or additional evidence on his or her behalf. (§ 1170.95, subd. (d)(3).) Providing the parties with the opportunity to go beyond the original record in the petition process, a step unavailable on direct appeal, is strong evidence the Legislature intended for persons seeking the ameliorative benefits of Senate Bill 1437 to proceed via the petitioning procedure. The provision permitting submission of additional evidence also means Senate Bill 1437 does not categorically provide a lesser punishment must apply in all cases, and it also means defendants convicted under the old law are not necessarily entitled to new trials. This, too, indicates the Legislature intended convicted persons to proceed via section 1170.95's resentencing process rather than avail themselves of Senate Bill 1437's ameliorative benefits on direct appeal.

Defendant resists this conclusion, arguing *Conley* and *DeHoyos* are distinguishable because the petitioning procedures enacted by Propositions 36 and 47 conditioned sentencing relief on a trial court finding that the defendant would not pose an unreasonable risk of danger if released, and section 1170.95 contains no such requirement. While defendant is correct that section 1170.95 does not require a dangerousness inquiry, neither

31

*Conley* nor *DeHoyos* holds that inquiry was the indispensable statutory feature on which the result in those cases turned. To the contrary, *Conley* notes "[o]ur cases do not 'dictate to legislative drafters the forms in which laws must be written' to express an intent to modify or limit the retroactive effect of an ameliorative change; rather, they require 'that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'" (*Conley*, *supra*, 63 Cal.4th at pp. 656-657; see also *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 312 [explaining *Conley* held *Estrada*'s inference of retroactivity was inapplicable because "the legislation contained *its own retroactivity provision*"].) Accordingly, we look not for specific procedural conditions, but for indicia of the Legislature's intent. Here, as we have already detailed, the other indications the Legislature intended to restrict individuals who have already been convicted to the petitioning procedure outlined in section 1170.95 are considerable.

Defendant additionally argues his right to seek reversal of his conviction on direct appeal is supported by other cases in which defendants were allowed to argue a conviction must be reversed on direct appeal due to a legislative change in the elements of a criminal offense. Both cases defendant cites in support of this argument involved changes to the substantive elements of the defendants' crimes before their sentences were final (*People v. Ramos* (2016) 244 Cal.App.4th 99; *People v. Collins* (1978) 21 Cal.3d 208), but neither involved a new or amended law that "modif[ied], limit[ed], or entirely forb[ade] the retroactive application of ameliorative criminal law amendments." (*Conley*, *supra*, 63 Cal.4th at p. 656.) They are thus inapposite here.

32

Defendant further contends section 1170.95, subdivision (f) supports his argument for direct appeal retroactivity because it states: "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner." The court in *Conley* rejected a similar argument concerning an analogous provision included in the text of Proposition 36, reasoning that provision "contain[ed] no indication that automatic resentencing—as opposed to, for example, habeas corpus relief—ranks among the 'rights' the electorate sought to preserve." (*Conley*, *supra*, 63 Cal.4th at pp. 661-662.) We reach the same conclusion here, where there is no indication that reversal of a defendant's sentence on direct appeal without compliance with the procedures outlined in section 1170.95 was among the "rights" the Legislature sought to preserve in enacting Senate Bill 1437.

We add a final note, albeit on a point not raised by defendant. Although we hold the section 1170.95 petition procedure is the avenue by which defendants with nonfinal sentences of the type specified in section 1170.95, subdivision (a) must pursue relief, we are cognizant of the possibility that some defendants may be able to present a particularly strong case for relief under the changes worked by Senate Bill 1437 and wish to seek that relief immediately rather than await the full exhaustion of their rights to directly appeal their conviction. Our holding today does not foreclose such immediate relief in an appropriate case.

Once a notice of appeal is filed, jurisdiction vests in the appellate court until the appeal is decided on the merits and a remittitur issues. (*People v. Awad* (2015) 238 Cal.App.4th 215, 220 (*Awad*); see also *People v. Scarbrough* (2015) 240 Cal.App.4th

916, 923.)  But a defendant retains the option of seeking to stay his or her pending appeal to pursue relief under Senate Bill 1437 in the trial court.  A Court of Appeal presented with such a request and convinced of its merit can order the pending appeal stayed with a limited remand to the trial court for the sole purpose of permitting the trial court to rule on a petition under section 1170.95.  (See, e.g., *Awad*, *supra*, at p. 222.)  In those cases where a stay is granted and a section 1170.95 petition is successful, the direct appeal may either be fully or partially moot.  If the petition is unsuccessful, a defendant may seek to augment the appellate record, as necessary, to proceed with any issues that remain for decision.

In light of our conclusion that defendant must file a section 1170.95 petition in the trial court to seek retroactive relief under Senate Bill 1437, we express no view on whether he should be granted Senate Bill 1437 relief.  That will be a question for the trial court in the first instance, if a section 1170.95 petition is filed.

DISPOSITION

The judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**


BAKER, Acting P. J.

We concur:



KIM, J.



JASKOL, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.